UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-80075-CIV-ALTMAN/Reinhart

VICTOR HERNANDEZ,

    *Plaintiff,*

*v.*

PALM BEACH COUNTY BOARD
OF COUNTY COMMISSIONERS,

    *Defendant.*

_____/

## ORDER GRANTING SUMMARY JUDGMENT

The Plaintiff, Victor Hernandez, is suing his former employer, the Palm Beach County Board of County Commissioners, for disability discrimination. But the relevant facts suggest that this case has nothing to do with discrimination. To the contrary, on Hernandez's own telling, the backdrop of this case is an age-old love triangle (or perhaps a rhombus): Hernandez and his co-worker swapped romantic partners, causing animosity between the two and impelling their colleagues to choose sides. Though undoubtedly unpleasant, this just isn't the kind of discrimination that's actionable under either the Americans with Disabilities Act or the Florida Civil Rights Act.

Meanwhile, Hernandez indisputably failed to perform his job on multiple occasions. His employer, the County, responded as one might expect—by reprimanding him and recommending counseling. But, because there's *no* evidence that *any* of the complained-of personnel actions stemmed from the County's desire to discriminate against him *based on* any perceived disability, the County's Motion for Summary Judgment ("Motion") [ECF No. 37] is **GRANTED**.

**THE FACTS**

Hernandez began working for the County's Fire Rescue Department as an emergency medical technician firefighter in 2008. *See* Defendant's Statement of Material Facts in Support of Motion for Final Summary Judgment ("Def. SOF") [ECF No. 38] ¶ 2.[1] He was promoted to officer lieutenant firefighter in 2014 and remained employed with the County until November 1, 2019, when he resigned. *Id.* ¶¶ 3–4.

**I.      The Work Environment**

Hernandez maintains that he was subjected to a "hostile work environment" because of his relationship with a co-worker's former spouse. *See* Plaintiff's Response to Defendant's Statement of Material Facts ("Pl. SOF") [ECF No. 41] ¶ 45. In 2017, Hernandez began dating Rachel Norman, the ex-wife of a co-worker, Alex Herrera. *See* Def. SOF ¶¶ 48–49. At the time, Herrera was dating Hernandez's ex-girlfriend, Nicole Ackerman. *Id.* ¶ 48. Hernandez says that the two—Herrera and Ackerman—perpetrated a "smear campaign" by circulating "compromising pictures" to Hernandez's supervisors. *Id.* ¶ 48.[2] Herrera also sent Hernandez a text message "holding up a . . . Norwegian Cruise Line towel with him sticking up the middle finger," because Ackerman "knew [he] liked those beach towels." Hernandez Dep. [ECF No. 38-1] at 76:9–25.

Hernandez testified that some of his co-workers were friends with Herrera, and that those co-workers tried to "make his job more difficult" because of his relationship with Herrera's ex-wife. *Id.* ¶¶ 49–56. He points, for instance, to one of Herrera's Facebook posts—about Hernandez's

---

[1] We cite to the Def. SOF only where Hernandez has failed to rebut a proposition the County has asserted in that document. *Cf.* S.D. FLA. L.R. 56.1(b) ("All material facts set forth in the movant's statement filed and supported as required above will be deemed admitted unless controverted by the opposing party's statement provided that the Court finds that the movant's statement is supported by evidence in the record.").

[2] One "compromising picture," for instance, appeared to show Hernandez with marijuana. *See* Hernandez Dep. at 57:5–25.

relationship with Norman—that some of his co-workers commented on, saying that, while the comments were not "discriminatory," they were "offensive." Hernandez Dep. at 73:23–75:11. Hernandez also complains about a flyer, posted at work, that read: "Victor Hernandez – Arrested and beaten by cops. Slept with out brothers wife." Def. SOF ¶ 56 (errors in original).

> In his Amended EEOC Complaint, Hernandez described these events this way:
>
> I was the victim of a smear campaign involving my ex-girlfriend (Nicole Ackerman) and current girlfriend of my fellow co-worker, Lt. Alejandro Herrera, where Ms. Ackerman and Lt. Herrera both anonymously sent allegedly "compromising" pictures to my supervisors with the hopes of getting me fired as a fire fighter and to end my career because Ackerman and I used to date and she was vengeful. However, the photos were deemed inconclusive, and I have been unfairly treated, threatened, mocked by my superiors ever since, and I have been sent to a mandated therapist, weekly, ever since even though the therapist has stated that there is no reason for me to be there. For the first Ten [sic] years of my employment I have received excellent yearly evaluations and was without incident requiring a write up. At the time this smear campaign was under investigation, I was under enormous stress and took leave to alleviate the stressful work environment and thereafter is when I was transferred to a new station assignment and started to receive multiple written reprimands, four in total, from Chief Gaffney that lead [sic] to his ultimate recommendation of dismissal as a firefighter.

Amended Charge of Discrimination ("Amended EEOC Complaint") [ECF No. 17-1] at 1. In March 2018, Hernandez decided to go on Family and Medical Leave Act ("FMLA") leave because of the "harassment" his relationship with Norman had subjected him to—harassment that (Hernandez felt) his superiors weren't handling appropriately. *See* Hernandez Dep. at 88:11–13, 160:1–161:16.

## II.     Employment Actions

During his time with the County's Fire Rescue Department, Hernandez violated several Department policies and, in some cases, was subjected to discipline. Def. SOF ¶¶ 18–47. The Fire Rescue Department has neutral disciplinary guidelines, which (depending on the type and frequency of the employee's violation) outline the kind of disciplinary action that should be imposed. *Id.* ¶¶ 16–17.

Before we get to the violations, though, we need to untangle the web of relationships that (Hernandez believes) led to the employment actions against him. As relevant here, Matthew Gaffney was the Fire Rescue Department's District Chief; Jason Wasielewski was the Battalion Chief who supervised Hernandez for about one year; and Brian Mulligan was the Battalion Chief who supervised Hernandez from time to time. *Id.* ¶¶ 10, 12–14. Hernandez has alleged that Herrera (whose ex-wife, recall, Hernandez was dating) was "close friends" with Division Chief Chris Hoch and that, because of that friendship, Hoch teamed up with the staffing officer to "place [Hernandez] in a battalion where more harassment could take place under the supervision of his friend Chief Gaffney." Pl. SOF ¶ 45. In other words, in Hernandez's telling, the Fire Rescue Department brought disciplinary actions against him as retribution for his frowned-upon relationship with Norman. *See* Hernandez Dep. at 178:5–7 ("I feel like I was put to work under Chief Gaffney by Hoch to proceed [sic] the nonstop harassment and retaliation."). How did it do this? Well, according to Hernandez, by allowing Herrera to petition Hoch to place Hernandez under the supervision of District Chief Gaffney who, though he apparently had no relationship with Herrera, *see* Matthew Gaffney Aff. [ECF No. 38-5] ¶ 5, was willing to torture Hernandez on Herrera's behalf.

### A.  The 2017 Violations

Hernandez was cited for two violations in 2017. *First*, on April 5, 2017, the County issued Hernandez a Notification and Acknowledgment of Violation of Rules and Regulations ("NOV") for backing up a rescue truck without a required backer. Def. SOF ¶ 18. While Hernandez was aware of this requirement, he chose not to use a backer because he felt it would be safer for his crew to stay in the vehicle. Pl. SOF ¶ 18. Perhaps predictably, as he backed up the rescue vehicle, he was struck by another car. *See* Hernandez Dep. at 41:13–23. *Second*, on May 5, 2017, the County issued Hernandez an NOV because he failed to timely complete his annual physical and fitness assessment. *See* Def. SOF ¶ 19. Hernandez concedes that he failed to fulfill this requirement. *See* Hernandez Dep. at 44:21–45:4.

### B.  The Welfare Check

The next violation occurred in January 2018. After Hernandez transferred to a new unit, he wanted to take some vacation—a request that had been approved by his prior team. Pl. SOF ¶ 20. So, in early January, Hernandez asked to be relieved of the 24-hour shift that had been scheduled for Monday, January 8, 2018. *Id.* But—the parties agree—Battalion Chief Mulligan granted Hernandez leave for only 12 of those 24 hours. *Id.*; Def. SOF ¶ 24. The parties disagree about which 12-hour shift Mulligan excused him from. Hernandez says that he was given the first 12-hour shift off, while the County maintains that Mulligan excused him from the second shift. *Compare* Pl. SOF ¶ 21 (asserting that Hernandez had been given the first shift off) *with* Def. SOF ¶ 21 (averring that Hernandez had been given the second shift off). Here's Hernandez's description of what happened:

> So during that process I had – I had asked for vacation time for that time, but obviously they moved my shift. So I no longer worked that day, but I also worked a day that I was supposed to be off.
>
> So I went to Chief Mulligan and asked him for the time off. He said that he will look into it – he said that he will look into it to see if I can get the time off and I advised him per our policy – per our County policy that if the County moves you, moves your shift, they have to give you the vacation time no matter what, even if they have to hire overtime or whatever the case may be.

Hernandez Dep. at 103:1–21.[3] Hernandez testified *both* that Mulligan permitted him to take only 12 hours of vacation (rather than 24) *and* that Mulligan specifically "told [Hernandez] he was giving [him] the first 12 hours" off. *Id.* at 121:6–10; *see also* Pl. SOF ¶ 21 (alleging that Hernandez was given the

---

[3] At one point, Hernandez appeared to concede that he was never given the first shift off. *See* Hernandez Dep. at 103:13–18 ("I explained that to -- to Chief Mulligan and he still took it upon himself and he told me -- verbally told me that he wouldn't give me the first 12 hours off, okay. So he did not give me the first 12 hours off, he gave me the last 12 -- the last 12 hours off of a 24 hour shift.").

first 12 hours off). Hernandez claims that Mulligan did this for a "malicious purpose"—because "he's under the supervision of Chief Gaffney and Chief Wasielewski." Hernandez Dep. at 119:20–21.[4]

In any event, Hernandez didn't show up for the first 12-hour shift—nor could he be reached. Def. SOF ¶ 25. The Department called him multiple times and left two voicemails—all without answer. Hernandez Dep. at 106:15–107:23. Hernandez says that he didn't answer those calls because he was sleeping. *Id.* And, in explaining why he didn't appear for his shift, Hernandez says that, "[d]uring that time, I was AWOL without me knowing because I assumed that I was supposed to get the first 12 hours off." *Id.* at 103:19–21. But the County uses a computer software called "Telestaff" to track leave requests and approvals—and (as both parties seem to agree) the Telestaff software noted that Hernandez was given leave *only* for the second shift. *See* Def. SOF ¶¶ 22–23; Pl. SOF ¶¶ 22–23 (disputing only whether Hernandez had any reason to check Telestaff—given Mulligan's representations to him—but not disputing the County's assertion that, according to Telestaff, he was given only the second shift off).

Trying to parry these facts, Hernandez alleges—without explanation—that the Telestaff data was modified in what he characterizes as "shady" and "highly suspicious" ways. Pl. SOF ¶¶ 21, 34. Hernandez never says what these modifications were. *Id.* Fortunately, the County has explained each Telestaff entry for us. Def. SOF ¶¶ 23, 34. *First*, after Mulligan (verbally) denied Hernandez's request for the full 24-hour vacation time, he made two entries in the system: he modified Hernandez's leave from 24 hours to 12, and then he approved the leave request. *Id.* ¶ 23. *Second*, about two months later (on March 7, 2018), Wasielewski printed the Telestaff data for January 8, 2018. *Id.* ¶ 34. He did this,

---

[4] Here (again) Hernandez appears to be gesturing towards the chiefs' relationship with Herrera. In other words, Hernandez seems to be saying that Mulligan tricked him as a way of fulfilling some obligation he (Mulligan) had to Gaffney—who (Hernandez insists) wanted to harass Hernandez as payback for Hernandez's relationship with Herrera's ex-wife, *even though* he (Gaffney) didn't know who Herrera was, *see* Matthew Gaffney Aff. ¶ 5 ("I do not know who Alejandro 'Alex' Herrera . . . is and do not ever recall interacting with him.").

the County says, in response to a superior's request and in the context of the County's decision to discipline Hernandez for going AWOL on January 8, 2018. *Id.* Hernandez offers no evidence to dispute these accounts and, at any rate, gives no explanation for his general view that these "modifications" evince some discriminatory motive. *See generally* Response at 14.

When Hernandez failed to show up for his scheduled shift—and couldn't be reached by phone—the County conducted a welfare check at his home. Def. SOF ¶ 31.[5] The County performs a welfare check if (1) it can't reach an employee who's gone AWOL and (2) the employee lives within its jurisdiction. *Id.* A welfare check is not a form of discipline; it's, rather, a way for the County to verify the wellbeing of an AWOL employee. *Id.*; *see also* Reginald Duren Aff. [ECF No. 38-7] ¶ 8 ("In my experience, when an employee is [AWOL], and he cannot be contacted by staff and he cannot be located, then it is common for staff to go by the AWOL employee's residence to try to make contact with the employee if the residence is within the County's jurisdiction. This is merely to check on the AWOL employee and is not in itself a disciplinary action.").

The County's Operational Procedure I-58 provides that AWOL employees are subject to discipline. *Id.* ¶ 26. The County determined that Hernandez was AWOL and issued him an NOV on January 23, 2018. *Id.* ¶¶ 26–29. For reasons that aren't clear, the NOV was (after a change in leadership) misplaced and, on March 6, 2018, had to be reissued. *Id.* ¶ 30. Given Hernandez's cumulative violations within a twelve-month period,[6] he was suspended for three shifts—as prescribed by the Department's neutral disciplinary policy. *Id.* Hernandez concedes that this is standard operating procedure. *See* Hernandez Dep. at 108:25–109:4 ("Q. If an employee failed to show up at work or a

---

[5] Chief Mulligan ordered the welfare check. *See* Brian Mulligan Aff. [ECF No. 38-8] ¶¶ 7–8.
[6] The other two violations were Hernandez's 2017 violations for failing to use a backer and failing to complete his physical. *See* Matthew Gaffney Aff. ¶ 14.

Fire Rescue employee failed to show up at work, would they normally be disciplined? A. If they did not show up to work, yes, ma'am, they would be disciplined.").

### C.  The POTUS Motorcade

In March 2018—about two months after he went AWOL—Hernandez showed up late for a presidential motorcade. On March 3, 2018, Hernandez was the officer in charge of escorting the President of the United States in a presidential motorcade detail. Def. SOF ¶¶ 39–40. As part of his duties, Hernandez had to report with his colleague, Chris Moore, to Mar-a-Lago for a vehicle sweep by 7:30 a.m. *Id.* Chris Moore was not an officer, was not in charge of this particular motorcade detail, and had never participated in a presidential motorcade detail before. *Id.* Hernandez, by contrast, *was* an officer, *was* in charge of this detail, and had participated in two prior presidential details before. Pl. SOF ¶ 40. As Hernandez put it, "my co-worker never had done a presidential detail, so it was up to me to get us there." Hernandez Dep. at 124:3–5.

Unfortunately, Hernandez didn't arrive until 8:00 a.m.—about thirty minutes after he was scheduled to arrive and after the presidential motorcade had already left. Def. SOF ¶ 41. Although Hernandez says that he was mistaken about the start time and that his GPS had sent him to the wrong entrance, there's no dispute that he didn't arrive on time for the motorcade. Pl. SOF ¶ 40. District Chief Gaffney investigated the incident, including by reviewing (1) the accounts of staff members with knowledge of the incident; (2) the calendar invitation for the assignment; and (3) the tracking data from the rescue truck Hernandez was driving that day. Def. SOF ¶ 42. After this review, District Chief Gaffney felt that, by failing to handle a very important task, Hernandez's actions reflected poorly on the Fire Rescue Department. *Id.* A few days later, therefore (on March 7, 2018), the County issued Hernandez yet another NOV—this time, for failing to arrive to his detail duties on time. *Id.* ¶ 43.

### D.  The Employee Assistance Program and the Employee Development Form

In his final complaint about the County, Hernandez quarrels with District Chief Gaffney's decisions (1) to provide him with an Employee Development Form ("EDF") and (2) to recommend that he participate in the Employee Assistance Program ("EAP"). The Fire Rescue Department uses several tools—separate and apart from the disciplinary process—to support and monitor its employees, including the EDF and the EAP. *Id.* ¶¶ 35, 44.

The purpose of the EDF is to provide "a method for documenting Fire Rescue personnel job performance *outside of the disciplinary process.*" Employee Development Memorandum [ECF No. 38-21] at 1 (emphasis added). "Supervisors are responsible for assessing and evaluating the adequacy of Fire Rescue personnel performance in relation to job requirements. Supervisors should utilize the Employee Development Form to document both positive and negative Fire Rescue personnel job performance as a method of coaching or counseling Fire Rescue personnel." *Id.* "The Employee Development Form is not a form of discipline, and shall not be used to identify an infraction or breaking of a Fire Rescue rule or regulation. The Employee Development Form is *not* the first step in the progressive discipline process." Employee Development Memorandum at 2 (emphasis added).

The EAP, for its part, is a neutral, voluntary, and non-disciplinary program that provides professional resources to any employees whose personal circumstances may affect their job performance. Def. SOF ¶ 35. For example, the EAP assists employees with handling job stress, financial difficulties, personal stress (including marriage and family difficulties), substance abuse problems, etc. *Id.* Employees may choose to participate through either self-referral or management referral. *Id.* Indeed, long before the events that gave rise to this case, Hernandez had referred *himself* to the EAP for support services. Hernandez Dep. at 131:11–22.[7]

---

[7] Hernandez testified that he was "not sure" why he'd previously decided to use the EAP—but he believed that he "was having problems with [his] ex-girlfriend at that time, so [they] were seeking counseling." Hernandez Dep. at 131:11–22.

On March 9, 2018, about a week after the motorcade incident, Hernandez had a meeting with District Chief Gaffney and Battalion Chief Wasielewski. *See* Pl.'s Response to Interrogatories [ECF No. 38-4] at 6. The parties appear to agree that, during that meeting, Gaffney referenced Hernandez's "personal issues"—*i.e.*, the problems he faced in his romantic relationship—and said that "you need to go to EAP if you want to keep your job." Def. SOF ¶¶ 36–37. While Hernandez claims that Gaffney also told him, in a way that was "[n]ot professional at all," that he had "mental health issues," Pl. SOF ¶ 37, Gaffney denies making any such comment, *see* Def. SOF ¶¶ 36–37.

On March 12, 2018, three days after that meeting, District Chief Gaffney gave Hernandez an EDF (to document the decline in his work performance over the previous year) and recommended a management referral to the EAP (to help Hernandez with any personal issues that might be affecting his work). *See id.* ¶ 45. While he was receiving the EDF, Hernandez asked Wasielewski—who was not involved with the welfare check—why the County had performed that check. *Id.* ¶ 32. Hernandez contends that Wasielewski responded with something to the effect of "what if you had hung yourself." Pl. SOF ¶ 32. Hernandez later testified (at his deposition) that Wasielewski's "comment was not sincere whatsoever at all." *Id.* As a result of the referral, Hernandez participated in EAP counseling. *Id.* ¶ 6.

### III.    This Case

In his complaint, Hernandez asserts three claims: "disability discrimination" under the Americans with Disabilities Act ("ADA") (Count I); "disability discrimination" under the Florida Civil Rights Act ("FCRA") (Count II); and "hostile work environment" under the FCRA (Count III). *See generally* Second Amended Complaint ("Complaint") [ECF No. 17].[8] On January 28, 2019, Hernandez

---

[8] There's been some confusion as to whether Hernandez is also advancing a retaliation claim. *See* Motion at 2 n.2. Hernandez has now put that confusion to bed by assuring all of us that he's pursuing no such claim. *See* Response in Opposition to Defendant's Motion for Summary Judgment

filed a charge of employment discrimination with the Equal Employment Opportunity Commission and the Florida Commission on Human Relations (the "EEOC Complaint") [ECF No. 17-1].[9] Def. SOF ¶ 5. On February 15, 2019, Hernandez filed an Amended EEOC Complaint. *Id.* ¶ 7. After protracted litigation, the County moved for summary judgment on all counts. *See generally* Motion.[10]

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material

---

("Response") [ECF No. 42] at 17 ("Plaintiff has not asserted a cause of action for retaliation in the operative pleading.").

[9] Hernandez appears to have attached both his original and amended EEOC complaints as one document—now docketed at ECF No. 17-1.

[10] The Motion is now fully briefed. *See* Response; Defendant's Reply in Support of Motion for Summary Judgment [ECF No. 47].

fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record" (quoting FED. R. CIV. P. 56 advisory committee's note)). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington*, 261 F.3d at 1265.

Finally, to survive a motion for summary judgment, the non-movant must do more than rely on bald speculation and conclusory allegations. *See, e.g., Cooper v. Southern Co.*, 390 F.3d 695, 745 (11th Cir. 2004) (holding that summary judgment was appropriate where the plaintiff relied only on conclusory assertions that were based entirely on her own subjective beliefs), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457–58 (2006); *Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) ("Conclusory, uncorroborated allegations by a plaintiff . . . will not create an issue of fact for trial sufficient to defeat a well-supported summary judgment motion."); *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("unsupported speculation" insufficient to satisfy a party's burden of producing evidence to withstand summary judgment).

## ANALYSIS

### I.      ADA Claim of Disability Discrimination

Title I of the ADA "prohibits discrimination on account of disability in employment." *Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007). "Before filing a complaint of discrimination against

an employer under Title I of the ADA, a plaintiff must first exhaust administrative remedies by filing a charge of discrimination with the EEOC." *Robbins v. Vonage Bus., Inc.*, 819 F. App'x 863, 866 (11th Cir. 2020); *see also* 42 U.S.C. § 12117(a) (incorporating Title VII's filing requirements into ADA actions). A plaintiff "is required to file an EEOC charge within 300 days of the discriminatory act for the claim to be actionable." *Penaloza v. Target Corp.*, 549 F. App'x 844, 848 (11th Cir. 2013); *see also* 42 U.S.C. § 2000e-5(e)(1) ("[S]uch charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred[.]").[11] The Supreme Court has warned that "strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 108 (2002) (quoting *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980)).

Because Hernandez filed his initial EEOC Complaint on January 28, 2019, Def. SOF ¶ 5, only events that occurred after April 3, 2018—*i.e.*, 300 days before he filed his EEOC Complaint—are actionable here. As the County points out, however, there are simply no acts in this case that fall within that 300-day period. To the contrary, as Hernandez concedes, this case is primarily about "events that occurred from January 2018 to March 2018" (*i.e.*, one month *before* the actionable time period). Response ¶ 2. So, for instance, Hernandez failed to use a backer in April 2017; he failed to complete

---

[11] Florida is a "deferral state," which means that the state "prohibit[s] the unlawful employment practice at issue and ha[s] established state or local authorities to grant or seek relief for such practice." *Maynard v. Pneumatic Prods. Corp.*, 256 F.3d 1259, 1262–63 (11th Cir. 2001). So, while an ADA plaintiff must ordinarily "file a charge complaining about an allegedly unlawful employment practice . . . with the EEOC within 180 days of the employment practice, [in a deferral state] the period for filing a charge with the EEOC may be extended to 300 days." *Id.*; *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) ("In a State that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency must file the charge with the EEOC within 300 days of the employment practice; in all other States, the charge must be filed within 180 days. A claim is time barred if it is not filed within these time limits."). The purpose of the deferral system is to "give[ ] the deferral state agencies notice of the alleged discrimination and an opportunity to investigate the allegations before the federal agency gets involved." *Maynard*, 256 F.3d at 1263.

his physical in May 2017; he went AWOL (and had to be checked on) in January 2018; he was given an AWOL NOV in March 2018; he was late to the motorcade detail in March 2018; and he was handed the EDF in March 2018. Because every "actionable" event in this case occurred *before* April 3, 2018, Hernandez's EEOC Complaint was untimely. *See Morgan*, 536 U.S. at 113 ("The charge . . . *must* be filed within the . . . 300-day time period after the discrete discriminatory act occurred." (emphasis added)).

Trying to dodge this result, Hernandez advances two arguments—both unavailing.

*First*, he contends that "procedural technicalities . . . should not be strictly interpreted" when it comes to EEOC claims. Response at 4. But, as we've said, the requirement that an EEOC charge be timely filed is no mere technicality. Far from it: the Supreme Court has specifically required "strict adherence" to the timeliness requirement and has noted that, "by choosing what are obviously quite short deadlines, Congress clearly intended to encourage the prompt processing of all charges of employment discrimination." *Morgan*, 536 U.S. at 109 (cleaned up). Unsurprisingly, not one of the cases Hernandez relies on allows courts to ignore this statutory timeliness requirement. Those cases only say that "the scope"—that is, the allegations—of the EEOC complaint "should not be strictly interpreted," which makes sense because EEOC complaints are often "prepared without the assistance of counsel." *Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004) (cleaned up). But they say *nothing* about ignoring the 300-day statutory period. Of course, even if they had, "this Court bears no warrant to ignore clear statutory language on the ground that other courts have done so." *BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1541 (2021) (cleaned up).

*Second*, Hernandez argues that a "continuing violation theory" saves his untimely EEOC filing "so long as the complaint is timely as to the last occurrence." Response at 5. As we've said, however,

*all* of the events Hernandez complains about are untimely[12]—which is reason enough to dispose of Hernandez's continuing-violation theory. But, even if it weren't, the Supreme Court has made clear that, although a "charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period.," an employee *must* "file his charge within the appropriate time period" for claims based on "discrete acts" (such as termination, failure to promote, or refusal to hire). *Morgan*, 536 U.S. at 122. Hernandez's ADA claim (Count I) falls squarely into this latter bucket of "discrete acts." That's because Hernandez specifically brought a hostile-work-environment claim *only* in Count III. Since his ADA claim is a disparate-treatment claim based on discrete acts (write-ups, a welfare check, and a suspension)—and *not* a hostile-work-environment claim—a continuing-violation theory simply isn't viable with respect to that count.

And courts in this Circuit have been clear on this point. *See, e.g., Villarreal v. R.J. Reynolds Tobacco Co.*, 702 F. App'x 797, 799 (11th Cir. 2017) ("But [the plaintiff's] disparate treatment claim does not fall within the scope of the continuing-violation doctrine."); *Abram v. Fulton Cnty. Gov't*, 598 F. App'x 672, 676 (11th Cir. 2015) ("The district court correctly concluded that the continuing violations doctrine was inapplicable in this case because [the plaintiff] did not raise a hostile-work-environment claim . . . ."); *Manley v. DeKalb Cnty.*, 587 F. App'x 507, 512 (11th Cir. 2014) ("The district court also correctly ruled that the continuing-violation doctrine did not apply to the plaintiffs' disparate-treatment claims . . . , because those claims were based on the alleged denial of promotions, write-ups, and suspensions, which were all discrete acts of discrimination."); *Ramon v. AT&T Broadband*, 195 F.

---

[12] In his Response, Hernandez does reference (in passing) to one incident involving a text message that occurred *after* he filed his charge. But he never contends that this incident forms the basis of any of his discrimination claims. Nor does he explain how we could ever consider a claim that arose *after* he filed his EEOC charge. He's thus waived any reliance on that incident. *Cont'l Tech. Servs., Inc. v. Rockwell Int'l Corp.*, 927 F.2d 1198, 1199 (11th Cir. 1991) ("An argument not made is waived . . . .").

App'x 860, 866 (11th Cir. 2006) (recognizing that the "statute of limitations for filing EEOC charges works differently for disparate treatment and hostile environment cases"); *Steinberg v. Donahoe*, 2014 WL 1356711, at *7 (S.D. Fla. Apr. 7, 2014) (Rosenbaum, J.) ("The problem with [the plaintiff's] position arises from the fact that the Supreme Court has flatly rejected the idea that discrete acts, such as the four [discriminatory comments] at issue in this case, may be viewed as a 'continuing violation' under a disparate-treatment theory.").

*     *     *

Because the events underlying Hernandez's ADA claim occurred outside the 300-day limitations period, he cannot maintain an action that's premised on those incidents. We therefore **GRANT** the County's Motion as to Count I. More fundamentally—and as we explain below—Count I would have failed even if we'd agreed that it was timely.

## II.     The FCRA Claim of Disability Discrimination

The FCRA "provides for a private right of action for violation of any Florida discrimination statute." *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1204 (11th Cir. 2007). "As a prerequisite to bringing an employment discrimination claim under the FCRA, an employee must file a complaint with the Florida Commission on Human Relations or the EEOC within 365 days of the alleged FCRA violation." *Rainey v. United Parcel Serv., Inc.*, 816 F. App'x 397, 401 (11th Cir. 2020); *see also* FLA. STAT. § 760.11(1) (providing that employees must file a complaint within 365 days of the violation).

"Claims brought under FCRA (the Florida analog to the ADA) are analyzed using the same framework as claims under the ADA." *Caporicci v. Chipotle Mexican Grill, Inc.*, 729 F. App'x 812, 815 (11th Cir. 2018) (citing *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1255 (11th Cir. 2007)). "An employee may demonstrate discrimination by either direct or circumstantial evidence." *Connelly v. WellStar Health Sys., Inc.*, 758 F. App'x 825, 828 (11th Cir. 2019). Direct evidence consists of "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of

16

some impermissible factor." *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1270 (11th Cir. 2017) (cleaned up). "Circumstantial evidence, by contrast, requires an inferential leap, suggesting—but not on its face proving—discriminatory intent." *Connelly*, 758 F. App'x at 828.

For cases premised on circumstantial evidence, courts employ the *McDonnell Douglas*[13] burden-shifting framework. *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1215 (11th Cir. 2021). Under that paradigm, "[t]o establish a *prima facie* case for disability discrimination, a plaintiff must produce sufficient evidence to permit a jury to find that [he]: (1) is disabled, (2) is a qualified individual, and (3) was discriminated against because of [his] disability." *Lewis v. City of Union City*, 934 F.3d 1169, 1179 (11th Cir. 2019) (en banc). After a plaintiff satisfies his burden of making a *prima facie* showing of disability discrimination through circumstantial evidence, "the burden of production shifts to [the employer] to articulate a legitimate, nondiscriminatory reason for its actions." *Todd*, 998 F.3d at 1216 (quoting *Holland v. Gee*, 677 F.3d 1047, 1055 (11th Cir. 2012)). "And if the [employer] satisfies that requirement, the burden shifts back to [the plaintiff] to show that the reasons the [employer] articulated are merely a pretext for discrimination." *Id.*

In trying to establish pretext, "the plaintiff 'must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination.'" *Wofsy v. Palmshores Ret. Cmty.*, 285 F. App'x 631, 634–35 (11th Cir. 2008) (quoting *Brooks v. Cnty. Com'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006)). A plaintiff may demonstrate pretext by "showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's rationale. But plaintiffs may not recast the reason or merely quarrel with its wisdom." *Jones v. RS & H, Inc.*, 775 F. App'x 978, 986 (11th Cir. 2019). That's because courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead our sole concern is whether unlawful discriminatory

---

[13] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

animus motivates a challenged employment decision." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).

One final point. To establish a discrimination claim, the plaintiff must show that he suffered an "adverse employment action." *Doe v. Dekalb Cnty. Sch. Dist.*, 145 F.3d 1441, 1449 (11th Cir. 1998). "[T]he ADA is not a code of civility, and allegations of adverse actions must be considered under both an objecti[ve] and subjective standard[.]" *Higdon v. Jackson*, 393 F.3d 1211, 1219 (11th Cir. 2004). In the ADA context, the "plaintiff must demonstrate that a reasonable person in his position would view the action in question as adverse." *Shotz v. City of Plantation*, 344 F.3d 1161, 1181 (11th Cir. 2003) (cleaned up). The action must, therefore, "result[] in some tangible negative effect on the plaintiff's employment." *Id.* (cleaned up). "[A]n employee must show a *serious and material* change in the terms, conditions or privileges of employment as viewed by a reasonable person in the circumstances." *Id.* (cleaned up).

The County contends—and we agree—that several of the complained-of employment actions are time-barred and that, either way, Hernandez hasn't suffered any *adverse* employment action *because of* any real or perceived disability. We address each act of alleged discrimination in sequence.

## A. The 2017 Violations

Hernandez has no viable claim for the two infractions he was charged with in 2017. That's the case for two reasons. *First*, the 2017 violations are clearly time-barred. As we've mentioned, to be timely, a plaintiff must file his EEOC charge within 365 days of the adverse employment action. *See* FLA. STAT. § 760.11(1). Because Hernandez filed his initial EEOC Complaint on January 28, 2019, Def. SOF ¶ 5, he cannot state a claim for any action that occurred *before* January 28, 2018. Hernandez was issued NOVs for his failure to use a backer and for his failure to complete his physical on April

5, 2017 and May 5, 2017, respectively. *Id.* ¶¶ 18–19. He, in short, filed his EEOC Complaint more than six months late.[14]

*Second*, even if the claim weren't time-barred, Hernandez couldn't establish a *prima facie* case based on the 2017 NOVs anyway. Hernandez, after all, concedes that "you're required to have a backer" and that he "failed to complete [his] annual physical/fitness assessment." Hernandez Dep. at 43:5, 44:22–23. He agrees, in other words, that he violated the County's rules, and he offers *no* evidence that the County treated him differently than anyone else because of some perceived mental-health issue. Pl. SOF ¶ 18. Instead, Hernandez quibbles with the wisdom of the County's policies, saying (for instance) that he thought it would be better not to use a backer. *Id.* But it's not discrimination for the County to punish one of its employees for admittedly failing to follow its policies—especially when the employee's only excuse is that he thought he knew better than his employer. Again, this Court is not "a super-personnel department that reexamines an entity's business decisions." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1244 (11th Cir. 2001) (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)). Hernandez, in sum, cannot use his decision to violate County policy to sustain a *prima facie* showing of discrimination.[15]

## B. The Welfare Check

For three reasons, Hernandez has likewise failed to establish any claim premised on the County's decision to conduct a welfare check when he went AWOL. *First*, any claim based on the welfare check would (again) be untimely. That's because the welfare check occurred on January 8,

---

[14] Any attempt by Hernandez to rely on a continuing-violation theory would fall short here, too. Count II, after all—like Count I—raises a disparate-treatment, not a hostile-work-environment, claim. *See supra* Section I. As with Count I, those discrete employment actions he complains about—and not some continuing hostility in the workplace—are the gravamen of Count II. Since those discrete actions occurred more than 365 days before he filed his EEOC Complaint, that complaint was untimely.

[15] Of course, even if he could make out a *prima facie* case, Hernandez couldn't rebut the County's legitimate, non-discriminatory reasons for issuing the NOVs: his undisputed failure to comply with the County's neutral, and generally applicable, policies.

2018—385 days before Hernandez filed his EEOC Complaint. Since Hernandez only had 365 days, he cannot assert a claim that's based on that welfare check. *See, e.g.*, *Bourne v. Sch. Bd. of Broward Cnty.*, 508 F. App'x 907, 909 (11th Cir. 2013) (affirming the district court's order granting summary judgment for the employer where the employee's EEOC complaint was filed two days late).[16]

*Second*, Hernandez failed to establish that the County conducted the welfare check "because of" his disability. The County presented evidence that it's "common for staff to go by the AWOL employee's residence to try to make contact with the employee if the residence is within the County's jurisdiction." Reginald Duren Aff. ¶ 8. While Hernandez attempts to refute the neutral nature of the County's policy by claiming that "[t]here's no other employee that they've ever broken into their house," Hernandez Dep. at 104:3–6, Hernandez presented *no* evidence that any other employee had similarly failed to answer the door when the County appeared for the welfare check. He's also offered no evidence that the welfare check was ordered as a way of punishing him for some supposed mental-health problems. Hernandez, in short, hasn't made out a *prima facie* case that he was discriminated against *because of* his disability.[17]

Indeed, Hernandez nowhere *actually* says that the County conducted the welfare check *because of* his disability. *See generally* Response. To the contrary, he repeatedly places the welfare check in the context of the harassment (he says) he was subjected to because of the love rhombus he was part of. So, for example, in describing why the welfare check (and the other events that took place between

---

[16] A continuing-violation theory is (again) inapplicable here. *See supra* note 14.

[17] Even if he had, he certainly hasn't rebutted the County's legitimate, non-discriminatory reason for the check: to verify his wellbeing. In the absence of pretext, a plaintiff may survive summary judgment only if he presents "a sufficiently persuasive 'mosaic of circumstantial evidence[.]'" *Washington v. United Parcel Serv., Inc.*, 567 F. App'x 749, 752 (11th Cir. 2014). Because Hernandez gives us no such mosaic— and never suggests that he could—he's waived that argument here. *See Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions.").

January–March 2018) should be considered timely for purposes of his EEOC Complaint, Hernandez devotes *over three pages* of his Response to a "timeline of harassment"—in which he details the implications he (and others) have drawn from the love rhombus he, Herrera, Norman, and Ackerman were involved with. *See* Response at 5–9. In doing so, Hernandez does a good job of showing that he was harassed *because of* his relationship with Norman. The problem, of course, is that none of this has anything to do with *disability* discrimination—the cause of action he has asserted in this lawsuit. *See, e.g.*, Hernandez Dep. at 178:5–18 ("Q. Okay. So, again, this all ties back to the Herrera and Norman issue and you dating Ms. Norman? A. Yes, ma'am.").

*Third*, Hernandez's claim fails for a simple and totally independent reason—a welfare check just isn't an "adverse employment action." To the contrary, a welfare check is simply one of the things the County does to make sure that its AWOL employees are safe and alive. Def. SOF ¶ 31 (noting that a welfare check "is not a form of disciplin[e], but rather a way to check[ ] on an employee's well-being."). Hernandez notably doesn't allege that the welfare check resulted in any "change in the terms, conditions or privileges of [his] employment"—much less a "serious and material change." *Shotz*, 344 F.3d at 1181. Nor does he present any evidence that the welfare check caused a "tangible negative effect" on his employment. *Id.* Instead, he complains about the welfare check only as an "invasion of [his] privacy." Hernandez Dep. at 105:19. That it may well be, but we aren't convinced that this invasion is sufficient to constitute an "adverse employment action"—and Hernandez, for his part, cites no case for the proposition that it is, *see generally* Response.

Nor could we really say otherwise. Would it really make sense for us to hold that the Fire Rescue Department was prohibited from checking in on the wellbeing of its employees—who, after all, have very difficult (and stressful) jobs—when they fail to show up for work and are unresponsive to persistent calls and messages? Of course not. To suggest that an employer—particularly a fire rescue department—cannot conduct a welfare check in these circumstances would be both dangerous and

ill-conceived: dangerous because it would prevent employers from intervening in a way that could save lives, *see* Def. SOF ¶ 31; ill-conceived because the welfare check, temporary and relatively innocuous as it seems to be, *see id.*, bears virtually no relationship to the kinds of detrimental employment actions that, in this Circuit, qualify as adverse, *see, e.g.*, *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020) ("Tangible employment actions consist of things that affect continued employment or pay—things like terminations, demotions, suspensions without pay, and pay raises or cuts—as well as other things that are similarly significant standing alone.").

Other courts have reached similar conclusions. For example, in *Caines v. City of New York*, 2015 WL 13021892 (S.D.N.Y. July 8, 2015), *aff'd*, 649 F. App'x 74 (2d Cir. 2016), a police officer failed to come into work (at the tail-end of his time off), and a supervisor "dispatched the . . . police to [the plaintiff's] home . . . to check on his welfare." *Id.* at 2 n.5. Although the plaintiff characterized the visit as "highly suspect," the court concluded that the welfare check "was not an adverse action, and [that the plaintiff] adduce[d] no evidence that tends to demonstrate that [the welfare check] was motivated by a desire to discriminate rather than a desire to make sure [the plaintiff] was alright." *Id.* Our case is just the same—and, for similar reasons, we reach the same conclusion.

Against all this, Hernandez presses three arguments—all meritless.

*First*, he says there's a genuine issue of material fact as to which half of the 24-hour shift he was excused from. *Compare* Pl. SOF ¶ 21 *with* Def. SOF ¶ 21. But this dispute (assuming it's genuine) is totally irrelevant. Hernandez may truly believe that the County switched the shifts on him—fair enough. But he doesn't allege—and he's provided no evidence for the proposition—that the County purposely mixed up the vacation times *because of* his (purported) disability. Instead, when asked if he thought Mulligan had switched his shifts for some malicious purpose, Hernandez said: "Absolutely . . . . 'Cause he's under the supervision of Chief Gaffney and Chief Wasielewski," Hernandez Dep. at 119:12–21—that is, co-workers who (Hernandez insists) are trying to punish Hernandez for dating

Herrera's ex-wife. On this connection between his relationship with Norman and Gaffney's animosity towards him, Hernandez was pellucid at his deposition. In his words:

> A. Okay. Yes, I feel like I was put to work under Chief Gaffney by Hoch to proceed the nonstop harassment and retaliation. That's what I meant by that. He could have easily put me anywhere else, but he specifically chose that station, that shift, that headquarters where the chief are there constantly. It wasn't -- it wasn't another station. It was specifically headquarters at that station to work directly under his supervision.
>
> Q. Now, you think Hoch's issue with you was because he was friends with Herrera and Little, correct?
>
> A. Yes, ma'am.
>
> Q. Okay. So, again, this all ties back to the Herrera and Norman issue and you dating Ms. Norman?
>
> A. Yes.

Hernandez Dep. at 178:5–19. Nor does Hernandez ever suggest that Mulligan harbored any ill will towards him—at least not the kind that he can trace to some desire by Mulligan to discriminate against him because of his (alleged) disability. Hernandez, in fact, specifically testified that Mulligan never made any *discriminatory* comments to him. *Id.* at 110:1–9. Again, since the complicated web of loyalties that lies at the heart of Hernandez's accusations stems from the fizzling and kindling of romantic relationships—or, put another way, since it has nothing to do with disability discrimination—it's not actionable here.[18]

---

[18] The cases Hernandez relies on are inapposite. For instance, in *Kragor v. Takeda Pharmaceuticals America, Inc.*, 702 F.3d 1304, 1307 (11th Cir. 2012), the Eleventh Circuit found that there was a genuine issue of material fact as to whether the company's legitimate, non-discriminatory reason was pretextual because "the corporate executive who terminated the plaintiff for alleged misconduct later said that the plaintiff was an exceptional employee who had done nothing wrong, had done everything right, and should not have been fired." For reasons that should be all too plain by now, this doesn't come close to resembling our story. The County, it goes without saying, never said that Hernandez was "an exceptional employee," doesn't agree that Hernandez did "nothing wrong," doesn't believe that Hernandez did "everything right," and (in any event) never "fired" him.

*Second*, Hernandez questions the wisdom of the County's practice of conducting welfare checks when there's "no reason to think" that an employee will be a danger to himself or others. *See* Hernandez Dep. at 105:9. The County conducts welfare checks for employees who (1) are AWOL and (2) live within its jurisdiction. *See* Pl. SOF ¶ 31. Both elements were satisfied here: Hernandez was AWOL, and Hernandez lived within the County's jurisdiction. And there appear to be good reasons for the County's welfare-check policy: even Hernandez, in fact, concedes that he works in a high-stress and demanding job. *See* Hernandez Dep. at 182:12–20. In any event, this Court cannot—and will not—question the County's judgment about the best way to check on the wellbeing of its high-stress employees. *See Davis*, 245 F.3d at 1244 (explaining that federal courts are not "super-personnel department[s] that reexamine[] an entity's business decisions" (cleaned up)).

*Third*, Hernandez argues that certain modifications the County made to the Telestaff system were "highly suspicious." *See* Pl. SOF ¶¶ 21, 34. But the County provides reasonable explanations for each of these modifications, and Hernandez has failed to produce *any* evidence to controvert those explanations. Def. SOF ¶¶ 23, 34. So, again, the County says that Mulligan made a modification when he approved a 12-hour, rather than a 24-hour, vacation. *Id.* ¶ 23. And Wasielewski made a second modification when he printed the Telestaff data at the request of a superior. *Id.* ¶ 34. In the face of this evidence, the Court doesn't credit Hernandez's unsupported allegation—based entirely on his own subjective speculation—that Mulligan and Wasielewski were somehow acting nefariously when they made these modifications. *See, e.g., Cooper*, 390 F.3d at 745 (holding that summary judgment was appropriate where the plaintiff relied on conclusory assertions that were based entirely on her own subjective beliefs); *Solliday*, 413 F. App'x at 207 ("Conclusory, uncorroborated allegations by a plaintiff . . . will not create an issue of fact for trial sufficient to defeat a well-supported summary judgment motion."); *Cordoba*, 419 F.3d at 1181 ("unsupported speculation" does not satisfy a party's burden of defending against a summary judgment motion); *Schultz v. Am. Airlines, Inc.*, 449 F. Supp. 3d 1301,

1317 (S.D. Fla. 2020) (Altman, J.) ("[A] plaintiff's untethered speculation is insufficient to survive a properly supported motion for summary judgment."), *aff'd*, 855 F. App'x 656 (11th Cir. 2021).[19]

Because Hernandez's complaint about the welfare check is untimely—and deficient in any event—he cannot state a claim that's based on this employment action.

### C. AWOL Discipline

For many of the same reasons, no reasonable jury would side with Hernandez on the discipline he faced for going AWOL (*i.e.*, the NOV and the three-shift suspension). *First*, any such claim would be untimely. The clock to file a discrimination charge begins to run "when the employee receives notice of the adverse employment action." *Kelly v. Dun & Bradstreet Corp.*, 457 F. App'x 804, 805 (11th Cir. 2011). Hernandez received notice of the NOV and the suspension on January 23, 2018, via an e-mail that read as follows: "this email shall be your written notification that you will face disciplinary action for your unauthorized absence on 1/8/18." Def. SOF ¶ 27. So, under Florida law, Hernandez had until January 23, 2019—or 365 days—to file his EEOC charge. *See* FLA. STAT. § 760.11(1). Because Hernandez didn't file his EEOC Complaint until January 28, 2019, it was 5 days late.[20] This,

---

[19] Although Hernandez doesn't raise the issue in his brief, his allegations that Wasielewski and Gaffney made "offensive" comments doesn't render the welfare check discriminatory, either. *See* Def. SOF ¶¶ 32, 36. Hernandez has presented *no* evidence that Wasielewski or Gaffney had *any* role in conducting the welfare check. And the record evidence suggests that it was Mulligan who decided to call for the welfare check. *See* Brian Mulligan Aff. ¶¶ 7–8. The closest Hernandez gets to suggesting that any of this is relevant is when he claims that "Wasielewski was a part of Plaintiff's chain of command and participated in administering discipline to Plaintiff." Pl. SOF ¶ 32. Even there, though, Hernandez doesn't allege that Wasielewski had anything to do with either the decision to call for the welfare check or its execution. As a result, Hernandez cannot use Wasielewski and Gaffney's (alleged) comments about his mental health as evidence that the welfare check was the result of some malicious intent to discriminate. *See Obregon v. Blackman*, 2017 WL 5598805, at *6 (S.D. Fla. Nov. 21, 2017) (Rosenberg, J.) ("The Eleventh Circuit has held that evidence of comments suggesting discriminatory animus can sustain a prima facie case only where a plaintiff demonstrates that the comments were in some way associated with the decision to [discipline] him." (cleaned up)).

[20] Because Hernandez never contests the County's position that the clock began ticking on January 23, 2018, he's waived any claim to the contrary. *Case*, 555 F.3d at 1329 ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions.").

of course, is enough to dispose of Hernandez's claim. *See, e.g.*, *Bourne*, 508 F. App'x at 909 (affirming the district court's order granting summary judgment for the employer where the employee's charge was filed two days late).[21]

*Second*, even if his claim *were* timely, Hernandez hasn't made out a *prima facie* case that these disciplinary actions were "because of" any perceived disability. Hernandez (again) concedes that, pursuant to the County's standard operating procedures, employees who go AWOL are disciplined. *See* Hernandez Dep. at 108:25–109:4 ("Q. If an employee failed to show up at work or a Fire Rescue employee failed to show up at work, would they normally be disciplined? A. If they did not show up to work, yes, ma'am, they would be disciplined."). And (it's undisputed) the County suspended Hernandez for three shifts because he'd committed several different violations over a one-year period—all in accordance with the County's neutral disciplinary guidelines. *See* Def. SOF ¶ 30 ("Due to Hernandez's cumulative violations within [a] twelve-month period, Hernandez was suspended for three shifts as outlined in the County's Fire Rescue Department's neutral disciplinary policy[.]"); Pl. SOF ¶ 30 ("Undisputed."). Hernandez hasn't pointed to *any* evidence that the County deviated from its standard practice here. He hasn't, for example, identified an employee who, after failing to show up for a shift, was *not* subject to discipline. He has, to the contrary, admitted the opposite. *See* Hernandez Dep. at 108:25–109:4. He's thus failed to make out a *prima facie* case that his discipline had *anything* to do with his perceived disability. And, even if he had, he's failed to rebut the County's legitimate, non-discriminatory reason for the NOV and the suspension: that he failed to appear for his shift on January 8, 2018. That's because there's no evidence that the County's reason is somehow "weak[], implausib[le], inconsistent[], incoheren[t], or contradict[ory]." *Jones*, 775 F. App'x at 986.

---

[21] A continuing-violation theory is (again) inapplicable here. *See* supra note 14.

In response, Hernandez says only this: "In light of Defendant's failure to follow established procedure in allowing Plaintiff to maintain previously granted vacation, and the illogic of Plaintiff agreeing to taking off the second half of a 24-hour shift, and the unexplained *post hoc* modifications made to TeleStaff, a reasonable juror could conclude that the AWOL discipline is unworthy of credence and pretext for unlawful, discriminatory activity." Response at 12. Each point misses its mark. We take them in turn.

*One*, Hernandez suggests that the County's unwillingness to allow him to take a previously granted vacation is somehow evidence of pretext. *Id.* We disagree. As we've noted, Hernandez has presented *no* evidence that Mulligan—who (he says) was responsible for granting him only 12 hours of vacation, *see* Hernandez Dep. at 103:1–18—harbored any animosity towards him *because of* any perceived disability. On the contrary, Hernandez testified that he never had "any conflicts" with Mulligan and that Mulligan had never "made any discriminatory comments" towards him. *Id.* at 110:1–9. Hernandez's *own* theory, in fact, was that Mulligan refused to give him his requested vacation because of Mulligan's connections with Herrera—connections that, again, are relevant only to Hernandez's relationship with Herrera's ex-wife and not to any supposed prejudice against people with disabilities. *Id.* at 119:12–21.

*Two*, Hernandez claims that it would have been "illogical" for the County to give him only the second 12-hour shift off. *See* Response at 12. Here, Hernandez adds that he only needed the extra time because he was going away on vacation for the weekend and wanted the subsequent Monday as a buffer between his vacation and his return to work. *Id.* at 11–12. Given this itinerary, Hernandez seems to think that 12 hours off on Monday *afternoon* would defeat the whole purpose of his plan—which was to avoid getting up early for work Monday *morning. Id.* But Mulligan concluded that the first 12-hour shift was unavailable because "Fire Rescue is required to provide enough staff coverage for all shifts," and there weren't enough firefighters for the Monday morning shift without Hernandez.

Brian Mulligan Aff. ¶ 5; *see also* Def. SOF ¶ 21. Hernandez has presented *no* evidence to undermine the veracity of Mulligan's explanation. Instead, he says only that Mulligan's decision had the unpleasant effect of shortening (what he intended as) his extended vacation. *See* Pl. SOF ¶ 21. That, however, does nothing to rebut Mulligan's legitimate explanation for his decision.

*Three*, Hernandez points (again) to the Telestaff modifications. As we've said, the County has offered detailed (legitimate) explanations for *each* of these modifications, Def. SOF ¶¶ 23, 34, and Hernandez has done nothing to rebut their explanations, *see generally* Response.[22] All we're left with, then, is Hernandez's unexplained speculation that those modifications were "shady" and "highly suspicious." Pl. SOF ¶¶ 21, 34. But unsupported speculation cannot act as a substitute for the kind of *proof* Hernandez needs to withstand summary judgment. *See Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1316 (11th Cir. 2003) ("[S]peculation cannot substitute for proof." (quoting *SEC v. Alejandro Duclaud Gonzalez de Castilla*, 184 F. Supp. 2d 365, 376 (S.D.N.Y. 2002))).[23] Hernandez has thus failed to show that the Telestaff modifications had anything to do with his alleged disability.

To summarize, then, Hernandez has failed to establish that, in disciplining him for going AWOL, the County acted "because of" his perceived mental-health disability. Even if he could make that showing, as we've said, any such claim would be untimely.

### D.  The POTUS Motorcade

---

[22] Again, there's no evidence that the County's explanations are somehow "weak[], implausib[le], inconsistent[], incoheren[t], or contradict[ory]," *Jones*, 775 F. App'x at 986.

[23] Hernandez never suggests that either Wasielewski's or Gaffney's (alleged) comments about his mental health have any bearing on the discipline he faced for going AWOL. *See generally* Response. He has thus waived any such contention. *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived."). Even if he *had* made that argument, though, we would have rejected it. That's because Hernandez hasn't shown that either his NOV or his suspension—both administered for his going AWOL—had *anything to do* with any beliefs Wasielewski or Gaffney held about people with disabilities. To the contrary, it's *undisputed* that the County—across the board—subjects employees to discipline for going AWOL. *See* Hernandez Dep. at 108:25–109:4. As a result, no reasonable jury could find that the execution of this otherwise-neutral policy was animated by some prejudice against the disabled.

It's undisputed that Hernandez—as officer in charge of the presidential motorcade detail—arrived at Mar-A-Lago *after* the motorcade had left. *See* Def. SOF ¶¶ 40–41; Pl. SOF ¶ 40 (admitting that "Plaintiff . . . arrived by 8:00 am"). If that sounds like gross negligence by an employee, that's because it is. After investigating the incident, the County disciplined Hernandez for his tardiness. Def. SOF ¶ 42. Grasping at—well, nothing really—Hernandez claims that this, too, was discrimination. Response at 16. How? Well, he says that his colleague, Chris Moore—who was also late—wasn't disciplined.[24] *Id.* But "[a] plaintiff attempting to prove discrimination by way of comparators must show that he and his proffered comparators are 'similarly situated in all material respects.'" *Vaughn v. FedEx Freight, Inc.*, 824 F. App'x 797, 804–05 (11th Cir. 2020) (quoting *Lewis*, 918 F.3d at 1218 (en banc)). And Moore was not "a similarly-situated comparator without a disability." *Payne v. Goodyear Tire & Rubber Co.*, 760 F. App'x 803, 810 (11th Cir. 2019). Moore (after all) was neither an officer nor in charge of the presidential motorcade—indeed, he had never even participated in a motorcade before—so the County chose to discipline Hernandez rather than Moore. *See* Def. SOF ¶¶ 39–40. This makes sense: while we may not care so much if a person in Moore's position is late, we can all agree (or so one would think) that it matters a great deal if the person *in charge of the detail* arrives after it's departed.

### E.  The EDF and the EAP Referral

Because the EDF (Employee Development Form) and the EAP (Employee Assistance Program) referral are not *adverse* employment actions, they cannot sustain Hernandez's ADA claim. Starting with the EDF, it's undisputed that the form is *not* part of the County's disciplinary process.

---

[24] Hernandez also tries to justify his tardiness by arguing that he was confused about the time. Again, totally irrelevant. It was (to our mind) perfectly reasonable for the Fire Rescue Department to discipline Hernandez *anyway*. In other words, it makes quite a bit of sense for the County to have a zero-tolerance policy when it comes to leading a motorcade for *the President of the United States*. In any case, it's not this Court's role to second guess the County's neutral (and generally applicable) policies.

Def. SOF ¶ 44; Pl. SOF ¶ 44 ("Undisputed [except for a legal objection that isn't relevant here]."). It is, rather, a form the County uses to communicate with its employees—to tell them when they've done well, to inform them when they've done poorly, and (in this latter case) to map out a strategy for improvement. Def. SOF ¶ 44 ("The purpose [of an EDF] is to initiate a method for documenting Fire Rescue personnel job performance outside of the disciplinary process by coaching or counseling Fire Rescue personnel."); Pl. SOF ¶ 44 (not disputing any of this). That's precisely what governmental entities (and, for that matter, private companies) *should* be doing with their employees—keeping open the lines of communication, motivating them to improve, and not waiting until the very last minute before telling them that their work product is deficient. The County gave Hernandez an EDF to document his decline in work performance. Def. SOF ¶ 45. Hernandez doesn't allege that he suffered any negative change—much less a "serious and material change," *Shotz*, 344 F.3d at 1181—as a result of having received this form, *see generally* Complaint; Response. In fact, in his Response, Hernandez says that the EDF constitutes an adverse employment action *only* "[t]o the extent that the EDF referred [him] to the EAP." Response at 16. In this way, he concedes that the EDF—standing alone—cannot sustain his charge of discrimination.

So, let's shift to the EAP referral. No reasonable juror could conclude that Hernandez's referral to the EAP constituted an adverse employment action. The EAP is *voluntary*, *see* Def. SOF ¶ 35,[25] and it's hard to imagine a reasonable person viewing this voluntary support system as adverse.

---

[25] Hernandez has taken a seemingly inconsistent position regarding this fact. While he doesn't dispute that the EAP is voluntary, *see* Pl. SOF ¶ 35 ("Undisputed."), he does allege that he was *forced* to participate in the EAP, *see* Hernandez Dep. at 31:12–17 ("They *made* me go to EAP, which is an Employee Assistance Program. I went there, I think, once or twice and the lady – the counselor that was asking me questions wrote a letter stating that I was not – I had no issues whatsoever and denied EAP and sent me back to work." (emphasis added)). But here's the point: whether voluntary or not, the EAP is certainly not *adverse*. And so, even if Hernandez *could* show that the County compelled him to participate in the EAP, he'd nevertheless fail to establish that this unwelcome (but harmless and admittedly temporary) distraction caused him any "serious and material change in the terms, conditions, or privileges of employment." *Shotz*, 344 F.3d at 1181-82.

More importantly, as with the EDF, Hernandez doesn't allege that he suffered any negative consequence—let alone a "serious and material change in the terms, conditions, or privileges of employment," *Shotz*, 344 F.3d at 1181–82—as a result of his participation in this program. In fact, years before any of the events that led to this case occurred, Hernandez—without any urging (or discrimination) from anyone—*voluntarily* enrolled in the EAP because of issues he was having with his then-girlfriend. *See* Hernandez Dep. at 131:11–22.

Consider the (bizarre) incentives we'd create by finding that an employer's decision to recommend counseling for a struggling employee constitutes an adverse employment action—sufficient to support a charge of discrimination. By so declaring, we'd be discouraging employers from looking out for the wellbeing of their employees, from fixing workplace issues before they worsened, and from taking the often-fruitful (and less-drastic) measures that, if tackled early, could prevent a later discharge or demotion. It just makes sense, in other words, for a company (or county) that cares about its employees to have a program in place that allows them to get help if they want to. And that's precisely the kind of behavior that we (as judges) should be encouraging, not punishing.[26]

Unsurprisingly, courts around the country have reached the same conclusion on this rather straightforward issue. *See, e.g.*, *Weaver v. City of Twinsburg*, 580 F. App'x 386, 391 (6th Cir. 2014) (holding that the plaintiff's "decision to take a suspension instead of participating in the EAP does not create a materially adverse employment action"); *Pumpido v. Sch. Bd. of Miami-Dade Cnty.*, 2003 WL 23312750, at *7 (S.D. Fla. Nov. 6, 2003) (Altonaga, J.) ("Referring the Plaintiff to the Employee Assistance

---

[26] Even if Hernandez could make out a plausible claim to adversity, the County has provided a legitimate reason for the EAP: to help its employees cope with the kinds of stressful situations—whether in or out of work—that might impact their job performance. *See* Def. SOF ¶ 35 ("The program assists in areas of job stress, mental or emotional situations, financial difficulties, marital or family stress, alcohol/substance abuse, legal problems and others."). And there's no evidence that the County's rationale is somehow "weak[], implausib[le], inconsistent[], incoheren[t], or contradict[ory]," *Jones*, 775 F. App'x at 986—no evidence, in short, that this explanation is mere pretext for something more sinister.

Program, threatening him with termination, or complaining to him about his work performance, too, do not rise to the level required for a finding of an adverse employment action."); *Ndzerre v. Washington Metro. Area Transit Auth.*, 275 F. Supp. 3d 159, 166 (D.D.C. 2017) (Leon, J.) ("[T]his Court has not found . . . a single case where a Court has held that referral to an EAP constitutes an adverse employment action. To the contrary, the weight of authority indicates that referral to an EAP does not constitute an adverse employment action[.]"); *Jenkins v. Med. Laboratories of E. Iowa, Inc.*, 880 F. Supp. 2d 946, 961 (N.D. Iowa 2012) (Reade, J.) ("The court finds that a requirement to attend EAP counseling does not constitute a tangible change in working conditions that produces a material employment disadvantage." (cleaned up)), *aff'd*, 505 F. App'x 610 (8th Cir. 2013).

For all these reasons, then, we **GRANT** the County's Motion as to Count II.[27]

### III.    The Hostile-Work-Environment Claim

Hernandez's hostile-work-environment claim fares no better. By his own telling, he was harassed only because of his relationship with Norman—and not because of any protected characteristic. To establish a hostile-work-environment claim, a plaintiff must show that:

> (1) he belongs to a protected group; (2) he suffered unwelcome harassment; (3) the harassment was based on a protected characteristic of the employee, such as [disability]; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for that environment under a theory of either direct liability or vicarious liability.

*Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1153 (11th Cir. 2020).

Throughout his deposition, Hernandez repeatedly claimed that he had been "discriminated" against—or that he'd faced a "hostile work environment"—because of his relationship with Herrera's ex-wife. *See, e.g.*, Hernandez Dep. at 75:6–11 (attesting that the Facebook post about him and Norman created a "hostile work environment"); *id.* at 90:1–11 (stating that his colleagues' "personal

---

[27] And, for all these same reasons, Count I would also fail—*even* if it had been timely.

relationship[s]" with Herrera "resulted in discrimination towards me within the workplace"); *id.* at 156:7–12 (asserting that all of the "retaliation" he was experiencing went back to "[d]ating Alex's ex-wife and everything that's been occurring"); *id.* ("If everything would have been handled when I was complaining, I feel like none of this would have escalated to exactly where it is today.").

In his Response, Hernandez just digs himself a deeper hole. *First*, he says (without elaboration) that his "harassment was based on the perceived disability of suicidal mental issues." Response at 17. But he cites no evidence for this proposition, leaving us to guess at what exactly he means. That's not enough to survive summary judgment. *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure *to make arguments and cite authorities* in support of an issue waives it." (emphasis added)); *A&E Adventures LLC v. Intercard, Inc.*, 2021 WL 1165244, at *1 (S.D. Fla. Mar. 26, 2021) (Altman, J.) ("But, to survive summary judgment, the plaintiff must adduce *some* evidence of [the disputed element]—something concrete with which a reasonable jury can do more than guess at a 'mere conclusion' from the 'highest level of abstraction.'" (citation omitted)).

*Second*, Hernandez cites the following actions as support for his hostile-work-environment claim: "Defendant broke into his house, disciplined him without cause, and referred him to an EAP despite no[] history of actual mental issues." Response at 17. Hernandez, though, points to *no* evidence that the County did any of these things *because of* any perception that he suffered from some disability. To the contrary, as we've repeatedly explained, the County did each of these things pursuant to general and neutral policies and for legitimate, non-discriminatory reasons.

We therefore **GRANT** the County's Motion as to Count III as well.[28]

---

[28] Although Hernandez never presses the issue in setting out his hostile-work-environment claim, the best evidence he has of discriminatory intent are the two comments (he says) Gaffney and Wasielewski made. Specifically, he testified that, on March 9, 2018, Gaffney referenced his "personal" and "mental health" issues. Def. SOF ¶¶ 36–37. Three days later, on March 12, 2018, Hernandez asked Wasielewski why the County had conducted the welfare check, and Wasielewski (according to Hernandez) said

CONCLUSION

Having carefully reviewed the parties' briefs, the record, and the governing law, the Court hereby **ORDERS AND ADJUDGES** as follows:

1. The County's Motion for Summary Judgment [ECF No. 37] is **GRANTED**. Pursuant to FED. R. CIV. P. 58, the Court will enter an order of final judgment separately.

2. The Clerk shall **CLOSE** this case.

3. All other pending motions are **DENIED as moot**, all hearings are **CANCELLED**, and any deadlines are **TERMINATED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 28th day of September 2021.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record

---

something like: "what if you had hung yourself." *Id.* ¶ 32. But Hernandez never links these comments to the conduct he complains about. So, for instance, it was *Mulligan* (not Gaffney or Wasielewski) who called for the welfare check. And Hernandez has presented no evidence (nor has he even alleged) that Gaffney and Wasielewski were in any way involved in that welfare check. As for the discipline he faced, Hernandez concedes that he committed the infractions the County charged him with, and he admits that the County disciplined him for these infractions in accordance with neutral (and generally applicable) policies. The *only* time Hernandez comes close to suggesting that the County acted on the basis of some prejudice against his disability is on the issue of the EAP referral. But (as we've said) the mere act of referring an employee—who had indisputably committed several infractions—to the EAP doesn't constitute an adverse employment action. Hernandez, at any rate, never adduces any of these facts in support of his hostile-work-environment claim—so he's waived any contention that these facts can sustain that claim. *See Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue waives it.").